## Case No. 5,122.

### The FRIENDSHIP.

## Case No. 5,123.

### The FRIENDSHIP.

[2 Curt. 426.] [2]

Circuit Court, D. Maine. Sept. Term, 1855.

[1] [Reported by Hon. William Cranch, Chief Judge.]

[2] [Reported by Hon. B. R. Curtis, Circuit Justice.]

## Case No. 5,124.

### The FRIENDSHIP.

[1 Gall. 45.] [1]

Circuit Court, D. Massachusetts. May Term, 1812.

[1] [Reported by John Gallison, Esq.]

G. Blake, for the United States.
Wm. Prescott, for claimant.

STORY, Circuit Justice (after stating the facts and the allegations). Upon the argument, the two first allegations are abandoned, and the attorney for the United States rests the cause altogether upon the third, and with great propriety, as the supreme court have already settled the only questions which could arise on the two former allegations against the construction, on account of which they were originally introduced into the libel.

It has been contended, on the part of the claimant, that the 8th section of the act alluded to, does not work a forfeiture, unless the vessel has actually performed a foreign voyage, and returned to the United States; and that part of the section which alludes to the forfeiture of goods imported in such vessel, is supposed to fortify this construction. It is certainly true, that by returning with a cargo to the United States, a vessel which contravenes the provision of this section, subjects the imported cargo to forfeiture. And so it has been adjudged by the supreme court, at February term, 1812. But this increase of forfeiture in a certain event, by no means proves that no forfeiture could accrue, without the return to the United States from a foreign voyage. The reason of affecting the return cargo was, without doubt, to take away the strongest temptation to an illicit employment of the vessel; by subjecting every thing to forfeiture which was connected with the voyage. The language of the statute is clear and explicit, and cannot, without manifest violence, be brought to the construction contended for.

I rely as little upon the suggestion, that the vessel was not subjected to forfeiture, because her enrolment and license were surrendered; although no register was taken out. The counsel for the claimant has assumed, that the words "and being duly registered," are used as mere idle words, and in no distinct connexion, and therefore are to be rejected as surplusage. It is true, that I can perceive no sufficient reason, why a register should in such case be required, when it is very certain, that in no other case

a register is absolutely necessary. Without a register, a vessel in foreign trade is not entitled to the privileges and benefits of a ship of the United States; but in other respects she is recognised by law. She may sail with a sea letter, or certificate of ownership. But it is sufficient for me, that the words of the statute are so; and when the legislature have expressly enacted a provision, the court have no other duty but to interpret it according to its genuine sense. Vessels engaging in the coasting trade and fisheries, engage upon the terms and conditions of the law, and are bound to comply with them.

But the main difficulty remains, did the Friendship "proceed on a foreign voyage?" It is contended by the attorney for the United States, that she did so proceed, although the vessel was not without the limits of the port of Ipswich; that "to proceed on a voyage," does not imply leaving a port; but may be satisfied with breaking ground, and sailing in a port, with intent to pursue such a voyage. And he relies upon the analogous case of an insurance from one port to another port, where the voyage commences on the breaking ground with intent to sail. Perhaps it may be answered, that in cases of insurance, an intent to deviate is not a deviation, and that sailing on a voyage with such an intent does not constitute the fact, until the vessel has actually passed the dividing or deviating line. But another answer is, that the cited case is of contract, where the intent of the parties is to prevail; and the law construes the risk, as commencing with the first inception of the voyage; in order more fully to effectuate the manifest intention of the parties. Policies of insurance are always liberally expounded for the benefit of trade. But the case is otherwise as to penal statutes. It is a maxim long since settled, that the construction of such statutes is to be strict; and a maxim so sanctioned by ages, and by the reason of things, I do not feel at liberty to disturb, upon supposed inconveniences. Sitting here to dispense justice, I am not at liberty to narrow the law, to suit any class of prosecutions. When the legislature speak directly, we must expound their acts according to their natural meaning, and obey their injunctions.

It does not, indeed, appear distinctly in evidence, which way the vessel was sailing, when seized; and if it be true (which has not been contradicted) that she could not pass the bar at the ebb tide; or if it be true, (which has been strongly sworn, even on the part of witnesses introduced by the government), that the sole object of moving the vessel was to prevent her grounding, and to get her into deeper water in the channel, it might be doubted, if there was a commencement of any voyage. But I confess, that the other facts in the case powerfully impress my mind with the belief, that the whole transaction was fraudulent. and that the intention was to violate the laws. The time, the place, the manner, and the conduct, of the business, equally show, that it was not fit to meet the day; and if the vessel had been seized without the port, it would not have been easy to remove the presumption of a foreign voyage.

But let us return to the construction of the act. The point is, not what the legislature might, but what they have, provided. At the time of the passing of this act, there was no prohibition of trade, and there was no necessity of jealously watching vessels while lying in port. The object of the act was, to prevent vessels engaged in the coasting trade and fisheries from becoming the medium of the introduction of smuggled goods, under the security and cover of their license. The words of the act are, "If any ship or vessel shall proceed on a foreign voyage," &c. Had the section stopped here, perhaps the construction of the attorney for the United States would have been very strong; but in the same sentence the legislature explain what they mean, by adding, "without giving up, &c., to the collector of the district comprehending the port, from which she is about to proceed on such foreign voyage." Such foreign voyage then is, to proceed from the port; not to commence within it; and the same expression is again repeated in the proviso.

The 32d section of the same act may throw some light on the subject. That provides that a licensed vessel shall be forfeited with her cargo, if found employed in any other trade, than that, for which she is licensed. Now if the Friendship had not given up her license, she would have been liable under this section; and, if the attorney for the United States be right, under the 8th section also. But I presume that the legislature intended the 8th section to apply to all cases, where a foreign voyage was pursued under any circumstances; and the 32d section to all cases, where the trading was in port or coastwise, when it was unauthorised by the license. I am somewhat confirmed in this construction by the language of the first and second sections of the act of 9th January, 1808, c. 8 [supra], which requires, that vessels employed in the coasting trade and fisheries should give bonds not to proceed to a foreign port, but to reland their cargo in the United States: and of the 3d section of the same act, by which the proceeding to a foreign port subjects the vessel and cargo to forfeiture. And by a subsequent act (March 12, 1808, § 1 [2 Stat. 473]) the same bonds are required of vessels, which are not registered, licensed, or possessing a sea letter. By these sections the legislature manifestly require a proceeding to a foreign port before a forfeiture is incurred. Now if the legislature did not declare a licensed vessel forfeited under the embargo acts, until she had actually arrived in a foreign port on a foreign voyage, but

suffered her departure on giving bonds, it would seem that it hardly contemplated that a foreign voyage was actually in progress while the licensed vessel was within our own ports. I do not, however, rely upon these acts, because, being passed on temporary occasions, they can hardly be considered as connected with the general system of our laws.

But what is the allegation in the libel? That the said vessel did "proceed from the said port of Ipswich upon a foreign voyage, without first giving up her enrolment and license, &c., and without being registered for said voyage." The plea is, "that the said vessel did not proceed from said port of Ipswich, &c., on any foreign voyage." Now it is undoubtedly true, that mere surplusage does not vitiate, and that an immaterial averment may be rejected. But it is also true, that when an averment is of substance, and is more specific than is necessary, and cannot be rejected without a fatal defect, it must be proved as laid (1 Chit. Pl. 231, 233); and penal actions in this particular are subject to as great, and formerly to greater, nicety, than others. In Rex v. Stevens, 5 East, 244, Lord Ellenborough said, that he did not find any authority in the law, which warranted him in rejecting any material allegation in an indictment or information, which is sensible and consistent in the place where it occurs, and is not repugnant to any antecedent matter. Now the allegation, that she did proceed from the port of Ipswich, is material. It was certainly material to state, that she proceeded from some place, or was at some place; for otherwise it would be impossible to know, to what offence the party was to answer, and he could hardly be enabled to produce evidence to defend his property from forfeiture, as every proceeding of the vessel, during the whole existence of the license, might equally come under review. In a case like the present, it would be peculiarly necessary, as no foreign voyage is alleged to have been completed to any foreign port.

If, then, the place be material to be laid, it should be proved as laid. In the Attorney General v. Moyer, Bunb. 260, the illegal importation was laid in the information in London, and the evidence showed it to be at Cowes, and the court held the variance fatal. If, however, I could get over this objection (on which I do not decide), and if I could also overlook various other errors and irregularities of form in the libel, I could not easily persuade my mind to adopt the construction adopted by the court below. For the opinions of that court I entertain every respect, because I know they are well considered and carefully weighed: But sitting here, it is also my duty to exercise my own judgment, and to decide accordingly. It is to be remembered, that this section of the act is highly penal. That the intent of the act, nay, the language of it, may be fully satisfied, without this rigorous construction. That it is the actual proceeding, and not the attempt to proceed, on a foreign voyage that is punished. That the great object of that act is, to secure the revenue of the United States from frauds, and to prevent a foreign trade from being carried on under color of a coasting license. With such considerations I cannot but interpret the law, as requiring, that the evidence of a foreign voyage shall at least be manifested by a departure from the port before the forfeiture attaches.

The decree of the court below [case unreported] is, therefore, reversed, and the property is to be restored to the claimant; but I shall certify reasonable cause of seizure. Decree reversed.